### In re the Application of John WALSH.

### No. Civ.A. 98–11638–WGY.

United States District Court,
D. Massachusetts.

Dec. 18, 1998.

E. Chouteau Merrill, Brown, Rudnick, Freed & Gesmer, Boston, MA, for John Walsh, plaintiff.

Thomas J. Barbar, Anne Marie Corraro, Cambridge, MA, for Jaqueline Walsh, defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

YOUNG, District Judge.

This sad case is a gritty refutation of the folk wisdom that marriages are made in heaven and Pliny's observation that "children are conceived by moonbeams."

John and Jacqueline ("Jackie") Walsh live in Ireland. John physically abuses Jackie. She drinks to excess and eventually takes up with another man. Each exaggerates the conduct of the other. The children—there are two, Mary Kate, 9, and Eoghain, 4—suffer. Eventually, Jackie flees from Ireland to the United States with her lover and her two children.

Her flight with the children gives rise to this litigation. The case arises under the Hague Convention on the Civil Aspects of International Child Abduction ("the Convention"), as implemented in the International Child Abduction Remedies Act ("the Act"), 42 U.S.C. §§ 11601–11610 (1998). Pursuant to the Convention, John seeks the return of Mary Kate and Eoghain to Ireland. Both the United States and Ireland are signatories

to the Convention, which establishes procedures for the prompt return of minors wrongfully removed from their State of habitual residence. *See* Convention, Art. 1. Under the Convention and its implementing legislation, the burden rests on the petitioner to show by a preponderance of the evidence that the removal was wrongful. *See* 42 U.S.C. § 11603(e)(1)(A). If the petitioner meets this burden, the respondent may oppose the return of the children by establishing that any of a number of narrowly drawn exceptions applies.

In this case, Jackie does not dispute that John has met his prima facie burden, but relies exclusively on an exception providing that a child need not be returned when "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention, Art. 13b. The burden now rests on Jackie to establish the applicability of that exception by clear and convincing evidence. *See* 42 U.S.C. § 11603(e)(2)(A).

## FINDINGS OF FACT

These are the facts. Jackie grew up in Malden, Massachusetts. She met John in a pub in Ireland in 1988 and they lived together off and on, John spending most of his time in Ireland and England and Jackie spending most of hers in Malden. Their first child, Mary Kate, was born in Boston on August 24, 1989. The couple married in May, 1992. It was his second marriage, her first.

Marital vows added no stability to this union. Incidents of physical abuse commenced within months. Jackie's aunt died on August 17, 1992. John expected to be asked to be a pallbearer and, when not invited, he shouted and screamed at Jackie, struck her several times, and squeezed her hand so hard that her thumb was swollen.

The following New Year's Eve, a drunken John subjected Jackie to severe verbal abuse. Ten months later, after imbibing a number of brandies, John became obsessed with the idea that a young neighbor next door had dealt the drugs that caused the death of another Malden youth from an overdose. Raging "I'll kill you," John began smashing on the neighbor's door until Malden police restrained and arrested him.

Facing a court appearance in the Malden District Court to answer charges of assault with intent to murder, John fled to Ireland in January, 1994. He dare not return, as a default warrant for his arrest has issued. Pregnant with their second child, Jackie followed. Despite her condition, John's physical abuse continued sporadically. In June, 1994, Jackie, then seven months pregnant, admitted to her gynecologist, Dr. Ann Marie Burke, that certain bruises she bore were the result of spousal abuse. Dr. Burke recommended that she document the abuse and seek legal help. Eoghain was born on August 25, 1994 in Waterford, Ireland.

As the victim of random beatings and the mother of two small children in a loveless marriage, Jackie felt increasingly alone and isolated in Tramore, a small town outside Waterford. One activity she shared with her husband was visiting the local pub. Like him, she sometimes drank to excess, sometimes becoming falling-down drunk.

In October, 1996, Jackie participated in a "pub quiz" concerning Irish sports. Afterwards, walking home, John ridiculed her and fell to punching her, kicking her prostrate body when she fell. Jackie went to a pharmacist, Ann Phelan, the following day and had herself photographed. The Court has reviewed the photos. They are inconclusive. They show cuts and short lacerations consistent with falling[1] or being knocked to the ground.

Jackie returned to Malden without the children in December, 1996, to spend the Christmas holidays with her father, paying for the trip with money her father had sent her. The night before she left, John pushed her so hard that she fell and hurt her coccyx,

---

**1.** John, not surprisingly, claims in his affidavit that Jackie simply fell down while drunk. Although his affidavit is hearsay, Fed.R.Evid. 801(a), as it must under the Convention, the Court considers it and the other materials attached to the petition as evidence in the case. *See* 42 U.S.C. § 11605. In all other respects, the Court applies the Federal Rules of Evidence to the data proffered. Fed.R.Evid. 101.

thus spending the entire trip in significant pain.

What of the children during these years? As is inevitable in these tragic cases, they were constantly exposed to their parents' acrimony and occasionally observed John's physical abuse of their mother as well. Mary Kate once fled the home when John was beating Jackie. Though sometimes inattentive, Jackie has never struck her children. John, however, is "strict" with the children, once spanked Eoghain and sent him to his room after finding him in the cookie jar, occasionally slapped Mary Kate across the back of her legs for various infractions, and once called her "stupid" and spit on her for having mud on her shoes.

Whatever hope there may have been for saving this marriage collapsed in May, 1997, at the time of Mary Kate's first communion. Jackie's sister Martha journeyed to Ireland for the event. Leaving the children with John, Jackie met Martha at the Dublin airport on May 16th. Martha had never before visited Ireland and the two traveled leisurely south to Tramore, celebrating Jackie's birthday on the 16th and arriving home on May 17th. During this leg of the trip, Jackie revealed John's physical abuse to Martha, who strongly urged her to leave John, advising her that John was a "bully" and would eventually hurt Mary Kate. Jackie and Martha then left together for a two or three day trip to Skibberene, spending a portion of the time with one Michael Murphy.

The communion service was scheduled for Sunday, May 24th. On Saturday evening, Jackie stayed home to prepare her daughter's dress and Martha, John, and Michael Walsh (John's eldest son by his first marriage—apparently an older teenager) went out to the pubs, enjoying Ireland's summer twilight. Michael Walsh broke a beer bottle. Saying, "I raised no son of mine to behave like that!," John attacked his son, fists flying. Michael stood up to his father briefly, but then fled. Martha and John (now bloodied) returned to the marital home. When Michael Walsh wandered in sometime later, the fight resumed. Martha testified she observed clots of blood from the fisticuffs on the fireplace hearth. Jackie and Mary Kate came downstairs and eventually the fighters subsided, mutually battered. Michael Walsh was sobbing and Mary Kate made efforts to console him. John said, "Mary Kate, take a look at your brother and tell him to leave; that you don't want him here." Jackie then interposed herself and pleaded with him to leave Mary Kate alone. John took Jackie upstairs and they fell to arguing and shouting. Jackie cowered on the bed as John circled it. He smacked her open-handed and when Martha called out "Are you all right?", Jackie replied "Yes."

Things, of course, were not "all right." Eventually, Martha slept in the bed with Jackie and John went elsewhere. The following day a battered John closeted himself alone, Michael Walsh apparently having given as good as he got, and the remainder of the family accompanied Mary Kate to her first communion.

This apparently was the last straw for Jackie. When next John raised his hand to her, she fled to the home of Paul Walsh, John's brother. When Michael Walsh arrived, crying, Paul called the police. Accompanied by the police, Jackie returned to the marital home to find John throwing her bags into the street. Jackie declined to press charges against John for assault, and the police recommended Jackie seek legal aid.

Supported by her legal aid lawyer, Aidan Lynch, Esq., Jackie obtained a Protective Order against John and negotiations commenced concerning who was going to live where and with whom. By July 13, John had agreed to vacate the marital home and Jackie had moved back in to rejoin the children. Jackie had also applied for a "barring order"—a longer-term order that would establish and govern the rights of each spouse to be in the presence of the other and to have access to their children. In so doing, Jackie submitted herself and the custody issues concerning the children to the courts of Ireland.

Driven out of the marital home by John, this period also saw Jackie take up a more or less open liaison with Michael Murphy.[2]

---

2. John suspects that his wife's infidelity pre-dates the final blow-up, that the relationship was under

While Michael Murphy did not live with Jackie, he was frequently at the home and their liaison was well known in the locality.

Not surprisingly, the absence of the constant tension and bickering between John and Jackie was beneficial to the children and they took readily to Michael Murphy. Jackie's new found companionship was not, however, an unmixed blessing. When she and Michael Murphy would go pub crawling, they would take the kids, who would often find themselves at a late hour sleeping in an out of the way corner of a hotel lobby or pub. This matter was of sufficient seriousness to come to the attention of Irish social service agencies who warned Jackie of her derelictions in this regard.

For her part, Jackie denies any lack of attention to her children and complains that the Irish social service agencies, the police, and indeed her own Irish lawyer are unsympathetic to her situation. She asserts that the social service agency pays little attention to the needs of her children and rebuffs her with the comment, "This whole situation is between two adults; the children are not involved." The police, she says, treat her complaints of breaking and entering (see below) with indifference. Her own lawyer told her unequivocally that she would have to give up Michael Murphy if she were to have a chance to obtain continued custody of the children.

Nor was the protective order adequate to keep the parties apart. During one evening when Jackie and the children were out with Michael Murphy, John broke into the home and smashed furniture and fixtures. Michael Murphy thrashed John, who preferred charges against him of assault and battery. As the date for hearing of the barring order (and the hearing on criminal charges against Michael Murphy for assault and battery) drew closer, tensions rose. John believed Jackie and Michael Murphy were attempting to suborn perjury by paying for evidence of John's spousal abuse. In early October, 1997, John again broke into the home when Jackie and the children were out for the evening.[3] He smashed everything breakable and threw turf around the floors before he left.

In November, 1997, Jackie left Ireland for her father's home in Malden. She took Mary Kate and Eoghain with her, having earlier taken the precaution of insuring that the children's passports were in order. While it plays no direct role in this Court's ultimate decision, the Court notes that among Jackie's incentives to leave Ireland is the well-founded belief that her chances of securing a divorce and custody of the children are greater in the United States than in Ireland. *See* Family (Divorce) Act, No. 32(c) (1996); Ir. Const. art. 41.3.2 (amended by Ir. Const. amend. XV [1995] ). Her flight was, in fact, an extreme form of forum shopping. Michael Murphy went along. Already possessed of a long criminal record replete with crimes of violence, he was unwilling to stand trial for assault and battery on John. Jackie and Michael Murphy now live together with the children in Malden.

The children have adjusted well to their surroundings in the United States and to Michael Murphy acting as a father figure. Jackie, however, has kept John from communicating with the children, and Mary Kate suffers from an adjustment disorder that one professional has diagnosed as post-traumatic stress disorder. Mary Kate does not wish to return to Ireland or to have anything further to do with her father.

way as early as the trip with Martha to Skibberene, and that when Jackie fled she actually abandoned John for Michael Murphy. The actual date of the relationship's commencement is of no moment to this opinion. Jackie admits to mid-June, 1997. The Court's general view of what happened is set forth in the text.

3. No one saw John break into the home on either occasion but circumstantial evidence points to him as the perpetrator. The Court reaches the conclusions about John's breaking and entering by employing the familiar fair preponderance of the evidence test to the record before it. It should be remembered that the Irish police need evidence that will potentially pass a beyond a reasonable doubt test before a prosecution can be brought. *See O'Leary v. Attorney Gen.*, 1 I.R. 102 (Ir.H.Ct.1990). This Court's findings cannot—and ought not—be read as impugning the willingness of the Irish police to investigate the report of crimes within their jurisdiction.

## CONCLUSIONS OF LAW

■ The Court begins by noting that article 13b does not permit an ad hoc inquiry into the merits of the underlying custody dispute. *See* 42 U.S.C. § 11601(b)(4); *Rydder v. Rydder,* 49 F.3d 369, 372 (8th Cir. 1995); *Blondin v. Dubois,* 19 F.Supp.2d 123, 126 (S.D.N.Y.1998). Those matters are reserved for the courts in the country of habitual residence, which are presumptively able to determine and protect the interests of the children. Accordingly, the grave risk of harm exception has been construed narrowly. "When we trust the court system in the abducted-from country, the vast majority of claims of harm—those that do not rise to the level of gravity required by the Convention—evaporate." *Friedrich v. Friedrich,* 78 F.3d 1060, 1068 (6th Cir.1996). An analysis performed by the Department of State explains further:

> A review of the deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child.

Public Notice 957, 51 Fed.Reg. 10,494, 10,510 (1986).

The decided cases provide a harrowing look at the kinds of deplorable circumstances that, nevertheless, fail to satisfy the article 13b exception. In *Steffen F. v. Severina P.,* 966 F.Supp. 922, 926 (D.Ariz.1997), for example, the court rejected the argument that the petitioner father posed a grave threat to his young son, despite the high probability that the boy's sister had been sexually molested, because it was not shown by clear and convincing evidence that the father committed the abuse. Similarly, in *Nunez–Escudero v. Tice–Menley,* 58 F.3d 374, 377 (8th Cir.1995), the court reversed the denial of a petition in a case involving allegations of physical and sexual abuse of the mother by the father, and general allegations of abuse among various members of the husband's family. The court held that such allegations concerned only "the problems between Tice–Menley, her husband and father-in-law," *id.,* and were immaterial to the article 13b inquiry. *See also K v. K,* 3 F.C.R. 207 (Eng.Fam.1997) (granting petition even though child witnessed several incidents of violence by petitioner father against mother); *N v. N,* 1 F.L.R. 107 (Eng.Fam.1994) (granting petitioner's request to return child to Australia despite sexual abuse of child petitioner); *Murray v. A.C.T.,* Appeal No. EA 51 (Austl. October 6, 1993) (affirming grant of petitioner despite evidence that petitioner father had inflicted numerous acts of violence upon children's mother in the presence of or in close proximity to children).[4]

■ It is thus apparent that the grave threat contemplated by the Convention must be directed at the children who are the subject of the petition, *see, e.g., Rechsteiner v. Kendell,* 80 A.C.W.S.3d 1195 (Ont.Fam.1998), and that such threat must be established by clear and convincing evidence. *See, e.g., Blondin,* 19 F.Supp.2d at 126–29 (denying petition where petitioner father routinely beat mother, hit child, twisted electrical cord around child's neck, and threatened to "kill everyone"); *Turner v. Frowein,* Docket No. FA–97–0084450 (Conn.Super.Ct. Jun. 25, 1998) (petition denied based on overwhelming evidence that petitioner father had sexually molested his son, the subject of the petition); *In re Ves,* 559SP (Ir.H.Ct.1996) (petition denied based on evidence of sexual abuse to children by petitioner father).[5]

---

4. Although decisions from foreign jurisdictions have no precedential weight, it is appropriate and desirable for the Court to consult these decisions along with those of courts in the United States in construing the terms and scope of an international convention. *See Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985).

5. There are reports, however, of some cases wherein courts have denied petitions due to situations that are much less threatening to the abducted child. For example, a French court reportedly refused to return a child to Los Angeles under Article 13b because of the polluted environment. *See* Court Awards $12.5 Million in Damages in International Child Abduction Case; Largest U.S. Verdict on Record, Bus. Wire, July 6, 19983; *see also PF v. MF,* 1992 Ir.S.C. 390 (Ir.1992) (denying petition based primarily on petitioner father's irresponsible management of

There are no allegations in this case, much less clear and convincing evidence, that the children are threatened with the degree of harm visited upon the children in *Steffen F.* and *Turner.* The evidence demonstrates that John is intemperate and often unkind to his children and that he spanks and slaps them for minor childish infractions, and of course, there is the constant exposure to verbal and physical conflict within the home. As regrettable, and indeed as reprehensible as this state of affairs may be, it does not furnish grounds to deny the petition. *Cf. Re HB*, 1 F.L.R. 392 (Eng.Fam.1996) (granting petition because ill-treatment, insensitivity, and inappropriate chastisement of children by petitioner mother did not amount to grave risk of harm); *K v. K, supra.* Whatever damage long term exposure to such a poisonous atmosphere may cause, the evidence does not reveal an immediate, serious threat to the children's physical safety that cannot be dealt with by the proper Irish authorities. *See In re BAD,* 113 M (Ir.H.Ct.1997) (granting petition and deferring to English courts' ability to protect child); *Murray, supra* (deferring to New Zealand courts to make appropriate orders to protect child).

The article 13b exception is similarly narrow with respect to a child's emotional well being. Some courts have recognized that separating a child from his or her primary caretaker may cause severe psychological harm, but have been reticent to apply the article 13b exception absent specific evidence that the child in question would suffer this type of harm. *Compare Rydder*, 49 F.3d at 373 (8th Cir.1995) (no specific evidence of potential harm to child where both parties were "intelligent, mature, loving parents") *with Steffen F.*, 966 F.Supp. at 927–28, 930 (psychological testimony established by clear and convincing evidence that child had bonded and attached to his mother, would not likely bond with his father, and therefore faced grave risk of harm in the event of removal).

Other courts have viewed evidence of this type of emotional harm with considerably

more scepticism. The English Court of Appeals held in *In re A.*, 1 F.L.R. 365, 372 (Eng.C.A.1988), that the harm required under article 13b is "something greater than would normally be expected on taking a child away from one parent and passing him to another" and concluded that evidence of parental bonding could not form the basis for a grave risk of harm. *See also Friedrich* 78 F.3d at 1067–68 (characterizing feelings of loss, abandonment, and anger as "nothing more than adjustment problems that would attend the relocation of most children").

Moreover, it bears emphasis that the appropriate order under the Convention is for the return of the children to the jurisdiction from which they were abducted. This Court is not in a position to make a custody order, and the children are not by virtue of this order removed from the care of one parent, or remanded to the custody of the other. Allegations of physical and psychological harm should be considered in the children's home jurisdiction. *See LAING and the Central Authority*, 21 Fam.L.R. 24 (Austl.1996) (holding that Georgia courts were appropriate forum to consider and determine allegations of physical, psychological, and sexual abuse). Even if the various anxiety and stress related conditions with which Mary Kate has been diagnosed approach the severe harm contemplated by article 13b, to the extent that the children may be spared both separation from their mother and exposure to their parents' fighting, concerns for their psychological well being are largely mitigated.

Jackie raises several additional matters that she maintains are relevant to the 13b consideration. She maintains that the difficulty she will have obtaining work in Ireland, a result of her lack of Irish citizenship, militates against granting the petition. She also suggests that the failure of Irish authorities to respond to her own complaints of abuse reveal an inability or unwillingness to protect the interests of her children, a factor she insists creates a grave risk to the children.

money); *MacMillan v. MacMillan,* 1989 S.L.T. 350 (Scot Ex.Div.1989) (denying petition based on evidence of petitioner father's alcoholism and

depression). These cases go against the overwhelming weight of authority.

In support of the first point, Jackie relies on *Panazatou v. Pantazatos*, 1997 WL 614519 (Conn.Super.Sept.24, 1997) (Interim Memorandum of Decision). That case, however, does not stand for the proposition that such practical concerns should prevent return of the children, but that the concerns may be eliminated or mitigated by means of appropriate undertakings. The court in *Panazatou* secured the promise of the petitioner father that he would provide proper housing and financial support for the child and mother. The *Panazatou* court held that the mother could not take advantage of her lack of employment prospects to prevent the return of the child, so long as the representations were honored. *See id.* at *2–4. In this case, the Court has also secured appropriate undertakings from John, which are discussed below.

As for the second contention, that the Irish authorities will not protect Mary Kate and Eoghain, Jackie relies on *Turner*, which, as discussed above, involved direct physical evidence of child molestation by the child's father. The Court in *Turner* did advert to the mother's allegations that Dutch authorities had not responded to or investigated her charges of child abuse. The court, however, made no specific findings on that point and rested its holding generally on all of the facts and circumstances of the case, the most compelling of which was the fact of the abuse itself. In any event, this Court has made no finding that the authorities in Ireland are unable or unwilling to intervene in cases of child physical or sexual abuse, or that they are not capable of protecting the best interests of Mary Kate and Eoghain once they are returned to Ireland.

Despite the truly deplorable circumstances in which Jackie now finds herself, and in the face of her laudable concerns for her children, she has not established by clear and convincing evidence that her children face a grave risk of exposure to serious physical or psychological harm, nor that their situation upon returning to Ireland will be intolerable. As a result, she may not lawfully maintain

her children here in the United States, and must return them to Ireland.

Having reached this conclusion, the Court faces numerous pragmatic issues that invite pragmatic solutions. Numerous courts granting petitions under the Convention have recognized the legitimacy of exacting appropriate undertakings from the parents designed to ensure that the children will be cared for properly during transit and that no harm will come to the children pending disposition in the country of habitual residence. *See Feder v. Evans–Feder*, 63 F.3d 217, 226 (3d Cir.1995); 63 F.3d at 226; *Re: K*, 2 F.L.R. 550 (Eng.C.A.1995); *Thompson v. Thompson*, 119 D.L.R.4th 253 (Can.Sup. 1994); *Re: O*, 2 F.L.R. 349 (Eng.Fam.1994); *C v. C*, 1 F.L.R. 403 (Eng.C.A.1989). With this end in mind, the Court requested and received the following undertakings from John and Jackie Walsh at the hearing on this matter.

John is to provide for the transportation and escort of the children back to Ireland. Once the children reach Ireland, John is to provide adequate housing, clothing, medical care and serve as a parental figure for the children. If John cannot provide adequate housing and provisions then he must provide the Court a detailed description of how the Social Services authorities in Ireland will make these provisions. In either event, the Court is to be informed specifically what provisions are in place before the children will be ordered returned to Ireland.

If Jackie determines to return to Ireland with the children, she must do so at her own expense. If she does return to Ireland, however, John must have no contact with her nor come within 10 miles of her residence, wherever she chooses to take up residence. Moreover, if Jackie returns to Ireland, John will have no contact with the children unless ordered by the authorities in Ireland. Each of these undertakings are conditions of this Court's order, and if any is violated, the order will be of no force and effect.[6]

---

**6.** Of course, an order by the Irish authorities that permits John to contact the children or Jackie shall not act to negate this order.

## CONCLUSION

The determination that Mary Kate and Eoghain do not face the kind of grave risk required by the article 13b exception does not in anyway diminish the deplorable conditions of domestic abuse that this Court has identified, nor should this decision be read to minimize the impact such violence has on the lives of children. This Court concurs in the recent conclusion of the Supreme Judicial Court of Massachusetts that a child who is forced to witness abuse within the family "suffers a distinctly grievous kind of harm." *Custody of Vaughn,* 422 Mass. 590, 595, 664 N.E.2d 434 (1996).

Notwithstanding these reservations, this Court exercises a limited jurisdiction, and the applicable law is narrow in purpose and effect. The sole objective of the Convention, and therefore of this Court, is to return Mary Kate and Eoghain to the country of their habitual residence, where the question of custody and well being properly may be adjudicated before a competent court. It is not the prerogative of this Court to determine or protect the best interests of the children, save only that the Court may act to avert truly extraordinary threats to their health and safety. The conditions to which Mary Kate and Eoghain are to be returned, while far from satisfactory, are not intolerable within the meaning of article 13b. Further, the Court has imposed, and the parties have consented to, such safeguards as will hold in abeyance any potential threat to the well being of the children, at least until their fate can be decided by an Irish court. As soon as the necessary undertakings are completed, the Court shall order the return of Mary Kate and Eoghain Walsh to Ireland forthwith.