**Stephen Halladay CROLL, Petitioner,**

v.

**Mei Yee CROLL, Respondent.**

**No. 99 Civ. 3566(SHS).**

United States District Court, S.D. New York.

Oct. 19, 1999.

Robert D. Arenstein, New York City, for Petitioner.

Lea Haber Kuck, New York City, for Respondent.

## OPINION & ORDER

STEIN, District Judge.

This action was brought pursuant to the Convention on the Civil Aspects of International Child Abduction entered into at The Hague in 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 ("Hague Convention" or "Convention") and implemented in the United States by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 et seq. Petitioner seeks an order directing his former wife to return their minor child to Hong Kong, her "habitual residence." Respondent has moved pursuant to Fed.R.Civ.P. 12(b) to dismiss the petition on the grounds that this Court lacks subject matter jurisdiction and the petition fails to state a claim for relief. Pursuant to the mandate for expedition set forth in the Convention, *see* Art. 11, on June 30, 1999 and July 6, 1999, this Court heard argument and received evidence relating to petitioner's application and respondent's motion. For the reasons set forth below, this Court finds that it has jurisdiction over this matter and that an order of return is justified.

## BACKGROUND

Stephen Halladay Croll and Mei Yee Croll were married in Hong Kong in 1982. (Tr. at 31).[1] In 1990, their daughter Christina was born in Hong Kong, where she lived with both parents until they separated in early 1998. (Tr. at 31–32, 46). Thereafter, Christina continued living with her mother in Hong Kong (Tr. at 109); her father, who also continued to live there, visited her regularly. (Tr. at 36). Mr. Croll testified that he saw Christina approximately two to three times each week and accompanied her to after-school activities. (Tr. at 36–37). Ms. Croll testified that Mr. Croll saw Christina approximately two times each month. (Tr. at 112).

Because all of her grandparents live in the United States, Christina has visited the United States on several occasions,

---

1. References to "Tr." are to the transcript of the hearings held in this proceeding.

usually for a few weeks during the summertime and during school holidays. (Tr. at 46–48, 66).

Sometime in 1998, Mr. Croll commenced a divorce action in the District Court of Hong Kong, Special Administrative Region, Matrimonial Causes. (Tr. at 33). Ms. Croll did not take part in that proceeding, and the parties dispute whether Ms. Croll ever received legally sufficient notice of its pendency. (Tr. at 35–36). On February 23, 1999, the Hong Kong court issued an interim order granting Ms. Croll "custody, care and control" of Christina, and granting Mr. Croll "reasonable access" to Christina. *See* Pet. Exh. 2. The order also directs that Christina

> be not removed from Hong Kong without leave until she attains the age of 18 years but provided that if either parent to [sic] give a general undertaking to the Court to return the said child to Hong Kong when called upon to do so, and unless otherwise directed with the written consent of the other parent, that parent may remove the said child from Hong Kong for any period specified in such written consent.

In addition, the order permitted either parent to request that the immigration department of Hong Kong not issue a passport for Christina to go abroad without that parent's consent. The February 23, 1999 order provides that it is to become final in six weeks unless cause is shown otherwise. Ms. Croll claims not to have had any actual notice of that order prior to the commencement of this Hague Convention action. (Tr. at 113–14). On May 3, 1999, the Hong Kong court issued an order requiring Mr. Croll to pay U.S. $1,000 per month to Ms. Croll for child support.

Mr. Croll testified that after he returned to Hong Kong from a business trip on April 7, 1999, he went to pick up Christina from her school, but was told by Christina's teacher that his daughter had not been in class for two days.[2] (Tr. at 37). Mr. Croll then went to Ms. Croll's apartment; not only did he find it empty of all furniture, but the housekeeper informed him that Christina and her mother had "left."[3] (Tr. at 37–38). Mr. Croll deduced from that statement that they had gone to the United States. (Tr. at 38). According to Mr. Croll, he called Ms. Croll's parents in New York several times in an attempt to locate Christina, but his calls went unanswered. (*Id.*). On April 22 Mr. Croll, on the advice of his attorney, filed a missing person report with the police in Hong Kong. (Tr. at 14–15, 40, 53). Shortly thereafter, he retained U.S. counsel and filed this application pursuant to the Hague Convention.

At the evidentiary hearing on the petition, Ms. Croll testified that she and Christina arrived in the United States on April 2, (Tr. at 63), and that Mr. Croll had previously consented to her relocating to the United States with Christina. (Tr. at 65, 115–16). Mr. Croll, however, denied having done so, although he concedes that he and his ex-wife did discuss this possibility before they separated. (Tr. at 36, 38, 48). According to Ms. Croll, she arrived in New York with the intention of having Christina interview at schools here and, if Christina were admitted, having her attend school for a few weeks for a "tryout period," and then return to Hong Kong for the summer, and arrive back in New York this coming fall. (Tr. at 63, 68–69). Ms. Croll testified that she and Christina had purchased return airplane tickets to Hong Kong for June 10, 1999. (Tr. at 69).

---

**2.** Ms. Croll testified that Christina was not at school on April 7 because her school was in recess from April 1 through April 12. (Tr. at 64). Mr. Croll disputes that. (Tr. at 38). It is unnecessary for this Court to resolve this factual dispute.

**3.** Mr. Croll testified that, after leaving Christina's school, he went to Ms. Croll's apartment and discovered that the apartment had been emptied. (Tr. at 37–38). Ms. Croll testified that when she left for the U.S. with Christina, she brought only two suitcases and did not empty the apartment of its furniture. (Tr. at 111).

After arriving in New York, however, she discovered that her ex-husband had terminated the lease to the Hong Kong apartment where she had been living with Christina and had a warrant issued for her arrest upon her return to Hong Kong. As a result, she decided to remain in New York. (Tr. at 69–70, 85–87). On cross-examination, however, Ms. Croll did concede that "[i]n the back of [her] mind" she had the intention of permanently remaining in the U.S. when she arrived here on April 2. (Tr. at 127). Mr. Croll denies that he took steps to have any warrant issued for Ms. Croll's arrest. (Tr. at 42).

On April 8, 1999, Ms. Croll commenced at least one action seeking orders of protection, custody, and support in New York State court (Tr. at 88); those proceedings have been stayed pending the outcome of this action.

## DISCUSSION

■ The Hague Convention was adopted by signatory nations "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." Hague Convention, Preamble. On September 1, 1997, the Convention entered into force between the United States and Hong Kong. The Convention prohibits a court where a petition is brought from ruling on the merits of the underlying custody dispute. See 42 U.S.C. § 11601(b)(4); Convention Arts. 16, 19. Those matters are reserved for the courts of the child's habitual residence, which are presumptively best able to determine and assess what is in the child's best interest. See Blondin v. Dubois, 189 F.3d 240, 246 (2d Cir.1999) (citing Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir.1993) (Friedrich I)).; Ciotola v. Fiocca, 86 Ohio Misc.2d 24, 684 N.E.2d 763, 769–70 (1997). This Court's duty pursuant to the Convention is to determine whether Christina has been wrongfully removed from the country of her habitual residence within the mean-ing of the Convention and, if so, to order that Christina be returned to Hong Kong unless certain narrowly-defined exceptions are present. See Convention Arts. 12, 13; Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir.1995); Friedrich I, 983 F.2d at 1400.

### I. Wrongful Removal

In a petition brought pursuant to the Hague Convention, the petitioner has the burden of establishing by a preponderance of the evidence that the minor child was "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1)(A). A removal or retention is "wrongful" if "(a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Hague Convention Art. 3. Where a child has been wrongfully removed and proceedings have been commenced within one year from the date of the wrongful removal, the Court "shall order the return of the child forthwith." Id. at Art. 12.

■ There is no dispute that Christina's habitual residence is in Hong Kong; she has lived there continuously since her birth. See, e.g., Friedrich I, 983 F.2d at 1402 (child's habitual residence was Germany where he resided exclusively until his contested removal). The Convention, however, only provides the remedy of return of the child when that child has been removed in violation of the non-consenting parent's right of custody, and does not provide this relief if the non-consenting parent had only a right of access, rather than a right of custody. See, e.g., Bromley v. Bromley, 30 F.Supp.2d 857, 860–61 (E.D.Pa.1998); Viragh v. Foldes, 415 Mass. 96, 612 N.E.2d 241, 246–47 (1993). A right of custody may exist by reason of

(1) operation of law; (2) a judicial or administrative decision; or (3) an agreement having legal effect under the law of that State. Convention Art. 3. Whether a parent was exercising lawful custody rights over a child at the time of removal must be determined pursuant to the law of the child's habitual residence. *See* Convention Art. 3; *Friedrich I*, 983 F.2d at 1402.

■ In support of his claim that he has a right of custody within the meaning of the Convention, Mr. Croll relies on the interim order issued by the Hong Kong court on February 23 which provides that Christina may not be removed from Hong Kong before her 18th birthday without either leave of court or the written consent of the other parent. Ms. Croll, on the other hand, contends that that order on its face simply provided Mr. Croll with a right of access to Christina, and not a right of custody and, therefore, the petition must be denied.

The right to determine a child's place of residence is tantamount to a "right of custody" within the meaning of the Convention. *See* Convention Art. 5. Although there is a dearth of federal case authority, several courts have held that a provision restricting a custodial parent's right to remove a child from a geographical area vests the non-custodial parent with a "right of custody" within the meaning of the Convention. *See, e.g., Janakakis–Kostun v. Janakakis,* —— S.W.3d ——, ——, No. 98–0259, 1999 WL 153369, at 5 (Ky. Mar. 19, 1999) (temporary order granting custody to respondent and prohibiting removal of child from Greece gave petitioner a right of custody within the meaning of the Convention); *David S. v. Zamira S.,* 151 Misc.2d 630, 635, 574 N.Y.S.2d 429, 432 (1991) (relying in part on respondent's contemptuous conduct in removing children in violation of order prohibiting removal of

the children from Ontario in deciding that petitioner had a right of custody within the meaning of the Convention); *B v. B.,* 3 W.L.R. 865 (U.K.Ct.App.1993)[4] (granting order for return of child where court had a right of custody by virtue of an interim custody order prohibiting custodial parent from removing child from Ontario); *C v. C,* 1 W.L.R. 654 (U.K.Ct.App.1989) (providing that "right to give or withhold consent to any removal of the child from Australia, coupled with the implicit right to impose conditions, is a right to determine the child's place of residence, and thus a right of custody within the meaning of arts 3 and 5 of the convention"); *Re H.,* 2 F.L.R. 439 (U.K.Fam.Ct.1990) (removing child from Ontario in violation of order granting respondent interim custody and prohibiting removal of child from Ontario without leave of court was in breach of respondent's rights of custody and wrongful within meaning of Convention).

As set forth above, the Hong Kong order dated February 23, 1999 provides that Christina may not be removed from Hong Kong before her 18th birthday without either leave of court or both parents' consent. Accordingly, this Court determines that Mr. Croll had a right, along with respondent, to determine Christina's place of residence and he had a corresponding right of custody within the meaning of the Convention. Christina's removal from Hong Kong—her habitual residence—was in violation of her father's right of custody and was, therefore, wrongful pursuant to the Convention.

## II. *Defenses*

■ Ms. Croll urges that even if this Court were to determine that her former husband has a right of custody pursuant to the Convention, an order directing that

---

4. Although decisions of a court in a foreign country have no precedential weight, such decisions are properly consulted when construing the terms and scope of an international convention. *See Air France v. Saks,* 470 U.S. 392, 404, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289 (1985) (determining what constitutes an "accident" within the meaning of the Warsaw Convention) (citing *Benjamins v. British European Airways,* 572 F.2d 913, 919 (2d Cir.1978)).

Christina be returned to Hong Kong should not issue because (1) Mr. Croll was not exercising his right of custody at the time of Christina's removal; (2) Mr. Croll consented to Christina's removal; and (3) returning Christina to Hong Kong would place Christina at grave risk of harm. All of these exceptions to the Convention are to be narrowly construed in order not to frustrate the objectives of the Convention. *See* 42 U.S.C. § 11601(a)(4).

### A. *Exercise of Custody Right*

Ms. Croll claims that even if Mr. Croll had a "right of custody" within the meaning of the Convention, he failed to exercise that right and, thus, an order of return should not issue. *See* Convention Art. 3(b). Ms. Croll has the burden of establishing this defense by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2)(B). Absent evidence that

> constitute[s] clear and unequivocal abandonment of the child [,] [o]nce [the court] determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

*Friedrich v. Friedrich,* 78 F.3d 1060, 1066 (6th Cir.1996) (Friedrich II); *see also Freier v. Freier,* 969 F.Supp. 436, 441 (E.D.Mich.1996); *Sampson v. Sampson,* 267 Kan. 175, 975 P.2d 1211, 1218 (1999). ■ Despite the parties' disagreement regarding the frequency of Mr. Croll's visits with Christina, he was exercising his right of custody at the time that Christina was removed from Hong Kong. Even if this Court were to credit Ms. Croll's testimony and assume that Mr. Croll visited Christina only twice per month, this evidence would be sufficient to find that Mr. Croll had not abandoned Christina and, thus, was exercising his right of custody prior to Christina's leaving Hong Kong.

*See, e.g., Sampson,* 975 P.2d at 1217–18. Consequently, petitioner has not relinquished his right of custody by failing to exercise that right.

### B. *Consent*

■ Ms. Croll also contends that Mr. Croll consented to her taking Christina to the United States to live. To establish this defense, Ms. Croll must show, by a preponderance of the evidence, that Mr. Croll consented to or subsequently acquiesced in the removal of Christina from Hong Kong. 42 U.S.C. § 11603(e)(2)(B); *see Friedrich II,* 78 F.3d at 1069.

First, Ms. Croll claims that because her former husband never exercised his right under the Hong Kong interim order to request that the immigration department not issue Christina a passport without his consent, he impliedly consented to Christina's removal from Hong Kong. That argument is not persuasive. *Krishna v. Krishna,* No. 97–0021, 1997 WL 195439, at 4 (N.D.Cal. Apr. 11, 1997), on which respondent relies, is distinguishable. In that case, the court found that Mr. Krishna "freely provided" Ms. Krishna with their child's passport after Mr. Krishna spoke with one of Ms. Krishna's relatives in the United States who informed him of Ms. Krishna's intention to come to the United States. No such facts are present here.

In this case, Ms. Croll testified that she had always had control of Christina's passport. (Tr. at 66). Moreover, Mr. Croll testified that he never requested Christina's passport from Ms. Croll nor requested that the immigration department not issue Christina a passport because he had no reason to believe that Christina would be taken abroad without his knowledge and consent. (Tr. at 52–53). Mr. Croll's failure to avail himself of the protections afforded by the February 23 order, while perhaps imprudent in hindsight, does not establish by a preponderance of the evidence that Mr. Croll impli-

edly consented to Christina's removal from Hong Kong.

Moreover, although both parties testified that prior to separating they had discussed relocating to the United States, these discussions are irrelevant to the issue of whether Christina's father consented to her relocation to the United States subsequent to the separation. While Ms. Croll testified that she and Mr. Croll had several "casual discussions" after they separated about Christina moving with her to the United States, Ms. Croll could only recall one such conversation in any detail. (Tr. at 116–17). Specifically, on March 2, 1999, Mr. Croll allegedly agreed that it would be beneficial for Christina to live in the United States. (*Id.*). Mr. Croll, however, testified that he did not agree to that. (Tr. at 36, 38, 48). Given the conflicting testimony of Mr. and Ms. Croll, along with the fact that Mr. Croll filed this petition pursuant to the Hague Convention for Christina's return within a few weeks of his daughter's departure from Hong Kong, this Court finds that Ms. Croll has not established by a preponderance of the evidence that Mr. Croll consented to Christina's removal from Hong Kong.

### C. *Grave Risk*

█ Ms. Croll also invokes the exception contained within Art. 13(b) of the Convention that provides that a child need not be returned to the country where the child is habitually resident if "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention Art. 13(b). A party seeking to invoke this exception must prove the applicability of the exception by "clear and convincing evidence." 42 U.S.C. § 11603(e)(2)(A). It is well-established that the grave risk exception is narrowly construed. *See* 42 U.S.C. § 11601(a)(4); *see also Blondin*, 189 F.3d 240, 246; *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 376 (8th Cir.1995) (citing *Rydder*, 49 F.3d at 372); *Janakakis–Kos-*

*tun*, —— S.W.3d ——, ——, 1999 WL 153369, at 6. In *Friedrich II*, the Sixth Circuit limited the circumstances under which the Article 13(b) exception applies to only when:

> return of the child puts the child in imminent danger prior to the resolution of the custody dispute—e.g., returning the child to a zone of war, famine, or disease [or when there has been] serious abuse or neglect, or extraordinary emotional dependence [and] the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

78 F.3d at 1069.

█ There is no dispute that the first of the circumstances set forth in *Friedrich II* does not apply here: Hong Kong is not a zone of "war, famine, or disease." Moreover, respondent has failed to demonstrate by clear and convincing evidence that returning Christina to Hong Kong would subject the child to a grave risk of harm or place her in an intolerable situation.

Ms. Croll testified to four specific instances to support her reliance on the Article 13(b) exception. First, she testified that on September 28, 1998, Mr. Croll assaulted her. (Tr. at 89, 98–99). Ms. Croll filed a complaint with the police relating to this incident, but the charges were dismissed due to an insufficiency of evidence. (Tr. at 42, 94, 96, 97–98). Although each party's version of this event differs, it is undisputed that Christina was not present during this incident. (Tr. at 90). The cases applying the Hague Convention make manifest that the Article 13 exception is only applicable when the child, as opposed to a parent, would be placed in danger if she were returned. *See Nunez–Escudero*, 58 F.3d at 376–77; *In re Walsh*, 31 F.Supp.2d 200, 205 (D.Mass.1998) ("It is thus apparent that the grave threat contemplated by the Convention must be directed at the children who are the subject of the petition ...") (citing *Rechsteiner v. Kendell*, 80 A.C.W.S.3d 1195 (Ont.Fam.1998)); *Ciotola*, 684 N.E.2d at

769 (insufficient evidence that child was at risk where child's mother testified that father had explosive temper and that she herself was victim of domestic abuse). Consequently, because this incident concerned solely Ms. Croll, even if this Court were to credit Ms. Croll's version of events, it would not support an Article 13 defense.

Second, Ms. Croll testified that on one occasion in November 1998, Mr. Croll forcibly dragged her into the bedroom where they struggled in front of Christina before their housekeeper intervened to stop the fight. (Tr. at 101). Third, Ms. Croll testified that, on another occasion, while bathing Christina, she observed a red handprint mark on her daughter's thigh that she had reason to believe was caused by Mr. Croll. (Tr. at 102–03). Finally, on one occasion in early 1999, when Christina expressed a reluctance to accompany Mr. Croll to Cape Cod for a visit, Mr. Croll forcibly placed his hands on Christina's shoulder and spoke to her in a forceful manner. (Tr. at 105–06). Ms. Croll conceded that she has never filed a police report on behalf of Christina and she has not made any allegations of abuse against her husband on behalf of her daughter in Hong Kong or the pending New York State matters prior to the hearing held before this Court on July 6. (Tr. at 89, 119, 134). Thus, Ms. Croll has not demonstrated by clear and convincing evidence that Christina would be placed in "grave risk" were she to be returned to Hong Kong. See Walsh, 31 F.Supp.2d at 206; Janakakis, —— S.W.3d ——, ——, 1999 WL 153369, at 6. Moreover, Ms. Croll has adduced no evidence to demonstrate that the Hong Kong courts would be incapable or unwilling to protect Christina adequately should she be in danger of being placed in a situation where she was at risk.

Because Christina has been wrongfully removed from her habitual place of residence and because none of the exceptions contained within the Convention apply, Christina should be returned to Hong Kong pursuant to ICARA and the Convention.

### III. *Undertakings*

In light of this Court's determination that petitioner's application should be granted directing that Christina be returned to Hong Kong, the parties were requested to attempt to agree on appropriate undertakings by petitioner to ensure that Christina does not suffer any short term harm pending disposition of any custody and support dispute in the Hong Kong courts. *See, e.g., Feder v. Evans–Feder,* 63 F.3d 217, 226 (3d Cir.1995); *Walsh,* 31 F.Supp.2d at 207. Any such undertakings would not affect the Hong Kong courts' ability to enter final orders concerning custody and support arrangements. However, the parties were unable to agree on specific undertakings.

Accordingly, the Court hereby conditions Christina's return to Hong Kong on respondent's compliance with the following undertakings:

(1) Mr. Croll shall pay the U.S. $1,000 support for Christina each month pursuant to the ex parte order of the Hong Kong court dated May 3, 1999;

(2) Mr. Croll shall pay for airline tickets to Hong Kong for Mei Yee Croll and for Christina; and

(3) Mr. Croll shall pay tuition and fees for the current academic year for the school that Christina attended during the 1998–1999 academic year.

Mei Yee Croll shall continue to have "custody, care and control" of Christina and Stephen Halladay Croll shall continue to have "reasonable access" to Christina pursuant to the February 23, 1999 order of the Hong Kong court. In addition, nothing in this Order shall be construed to prevent either petitioner or respondent from seeking a modification of the ex parte orders of the Hong Kong court dated February 23, 1999 and May 3, 1999 providing for custody and support for Christina and maintenance for respondent.

## CONCLUSION

For the foregoing reasons, respondent's motion pursuant to Fed.R.Civ.P. 12(b) to dismiss the petition is denied and petitioner's application for an order pursuant to the Hague Convention directing the return of the parties' minor daughter to Hong Kong is hereby granted upon condition that petitioner provide the undertakings set forth above.