Gia Kaylna JANAKAKIS–KOSTUN, Appellant,

v.

**In re The Application of Emmanuel JANAKAKIS, Appellee.**

No. 1998–CA–000259–MR.

Court of Appeals of Kentucky.

March 19, 1999.

Discretionary Review Denied by Supreme Court Dec. 9, 1999.

845

William D. Rogers, Kathleen A. Behan, Laura K. McNally, Layli Miller–Bashir, Dinesh Verma, Arnold & Porter Washington, DC, Stephen Miller, Mulloy, Fore, Miller & Schwartz, Louisville, KY, Aman-da Anayati, Tahirih Justice Center, Falls Church, VA, for Appellant.

Stephen T. McMurtry, McMurtry and Wolff Covington, KY, for Appellee.

Before EMBERTON, KNOPF, and SCHRODER, Judges.

*OPINION*

KNOPF, Judge.

This is an appeal by Gia Kaylna Jana-kakis–Kostun (Gia) from an order of the Hardin Circuit Court granting the motion of appellee, Emmanuel Janakakis (Emmanuel), to require Gia to relinquish custody of the parties' daughter, Bronte–Judith–Despina (Bronte), to Emmanuel and permitting the return of the child to Greece. This matter arose on Emmanuel's motion to return the parties' child, Bronte, to Greece pursuant to the terms of the Hague Convention on the Civil Aspects of Child Abduction, October 25, 1980, 1988 WL 411501 (entered into force December 1, 1983) (hereinafter Hague Convention). The Hague Convention has been signed by the United States, and Congress has adopted procedures for its implementation by enactment of the International Child Abduction Remedies Act. 42 U.S.C. § 11601, *et seq.* Greece is likewise a signatory to the Hague Convention. We affirm.

Emmanuel is a citizen of Greece and a captain in the Greek Navy. In 1986, while on a two-year assignment to the United States Naval Base at San Diego, California, Emmanuel met Gia, a member of the U.S. Navy, and a relationship developed between the parties. In 1988, Emmanuel's tour of duty in the United States ended, and he returned to Greece. At about the same time, Gia decided to leave the U.S. Navy. In November 1988, Gia traveled to Greece to be with Emmanuel, and the parties were married on September 2, 1989. On October 2, 1991, Bronte, was born in Chania, Greece, on the Island of Crete. Following Bronte's birth, Gia and

Bronte made yearly visits to the United States to visit Gia's relatives, though, because of conflicting evidence, the trial court was unable to determine the exact dates and duration of the visits. However, Gia and Bronte spent approximately three to four months in the United States in each of the years 1992, 1993, and 1994.

At some point the parties' marriage began to deteriorate, and sometime in 1995 Gia threatened to leave with Bronte. Consequently, Emmanuel began to have concerns about Gia removing Bronte from Greece without his knowledge or permission. On February 24, 1996, Gia told Emmanuel that she was going to the United States and was going to take Bronte with her. Gia thereupon left the marital residence in Chania, taking Bronte with her, and went to Athens with the intention of flying to the United States and settling permanently. Emmanuel thereupon filed a criminal complaint charging Gia with interfering with his custodial rights.

On February 27, 1996, Emmanuel filed a petition in the Lower Court of Athens, Security Measure Division, seeking temporary custody of Bronte. The Court issued an order prohibiting the removal of Bronte from Greece and scheduled a hearing on the merits of Emmanuel's petition. Gia attempted to leave Greece with Bronte on February 27, but, pursuant to the court order, this was prevented by Greek authorities. Gia alleges that subsequent to her detention, she and Bronte were abused by Greek authorities. On March 28, 1996, a hearing was held in the Athens Court. On April 22, 1996, the Athens Court issued an order prohibiting the removal of Bronte from Greece until a final determination of custody.

On February 28, 1996, the aforementioned criminal charge was heard by an Athens Court. The charges were dropped after the hearing. Emmanuel claims that the charges were dropped because all he wanted was to keep Bronte in Greece, not actually prosecute Gia. Gia claims the charges were dropped following an eviden-tiary hearing because the judge found the charges to be without merit. In any event, the charges were dropped and Gia was released from custody. Gia and Bronte thereupon returned to live with Emmanuel at the parties' marital residence. On May 2, 1996, Gia departed the marital residence with Bronte and went to the Greece hotel lodgings of her father, George William Kostun. Emmanuel subsequently retrieved Bronte from the hotel and refused to allow Gia to communicate with Bronte.

Also on May 2, Gia filed a petition in the Lower Court of Chania seeking custody of Bronte. On June 28, the Chania Court issued an order, *inter alia,* assigning "temporarily to [Gia] the care of ... [Bronte] until issuance of the final judgment[.]" The Chania order recognized that the April 28 Athens order prohibited the removal of Bronte from Greece and did not set aside or otherwise disturb that prohibition. Pursuant to the Chania order, on July 1, Emmanuel relinquished custody of Bronte to Gia. Gia alleges that upon Bronte's return to her, Bronte was suffering from a variety of physical and emotional problems, though this is denied by Emmanuel. A final hearing was set on Gia's custody petition for September 5, 1996. On July 4, Emmanuel filed a petition seeking specific rights of communication and visitation with Bronte. On July 22, the Chania court awarded Emmanuel liberal visitation and communication rights with Bronte. The order threatened Gia with a fine and imprisonment for violation of the visitation and communication rights established therein.

When Emmanuel subsequently attempted to exercise his communication and visitation rights, he was unable to locate Gia and Bronte. As it turns out, sometime in late July or early August 1996, Gia, with the help of her father, a former Green Beret with multiple European contacts, smuggled Bronte out of Greece. Upon arriving in the United States, Gia and Bronte initially stayed, variously, with Gia's father in Gray Hawk, Kentucky, with

Gia's mother in Houston, Texas, and in Elizabethtown, Kentucky. Finally, sometime in the Spring of 1997, Gia and Bronte came to Elizabethtown where they remained.

In the meantime, Emmanuel sought to find his daughter. On July 27, 1996, he filed another action in the Chania Court. A hearing was set on that action for January 16, 1997. On September 5, 1996, the hearing on Gia's petition was held as scheduled. While Gia, no longer in Greece, did not appear, Emmanuel testified that her attorney was present. That hearing was continued until January 16, 1997, so that all pending matters could be heard together. Following the January 16, 1997, hearing, by order dated February 28, 1997, the Lower Court of Chania assigned "exclusively to [Emmanuel] the exertion and care of [Bronte] [.]"

On November 14, 1996, Emmanuel applied for relief with the Greek Central Authority responsible for implementing the Hague Child Abduction Convention. He first sought enforcement of the Hague Convention in Houston in March of 1997. On March 28, 1997, Emmanuel filed a petition in Hardin Circuit Court pursuant to the Hague Convention, where service on Gia was obtained. On November 13, 1997, the trial court entered an order sustaining Emmanuel's motion for the return of Bronte to his custody and authorizing Bronte's return to Greece. Following a denial of Gia's motion to alter, amend, or vacate, this appeal was taken. On February 11, 1998, this Court denied Gia's petition for an emergency stay of the trial court's order pending appeal; however, on March 20, 1998, Kentucky Supreme Court Chief Justice Robert F. Stephens granted a stay pending further order of the full Supreme Court. On May 14, 1998, the Supreme Court dissolved the temporary stay. On June 18, 1998, United States Supreme Court Justice John Paul Stevens denied Gia's application for a stay pending appeal. On June 29, 1998, Gia delivered Bronte to Emmanuel, and Emmanuel and Bronte returned to Greece.

The Hague Child Abduction Convention and the International Child Abduction Remedies Act each require an abduction or wrongful retention to trigger their provisions and protections. *Harsacky v. Harsacky*, Ky.App., 930 S.W.2d 410, 413 (1996). Under Article Three of the Hague Convention, removal or retention is considered wrongful where there is a breach of custody rights under the law of the state in which the child was a habitual resident immediately before the removal or retention. *Id.* It follows that a child cannot be wrongfully removed or retained if the jurisdiction to which the child is taken can be considered its habitual residence. *Id.* Gia first argues that the trial court erroneously concluded that Greece was the habitual residence of Bronte, and contends that Bronte's habitual residence at the time of her removal was, in fact, the United States.

Neither the Hague Convention nor the International Child Abduction Remedies Act defines "habitual residence." Indeed, it was intended that this concept remain fluid and fact-based, without becoming rigid. *Id., citing Brooke v. Willis*, 907 F.Supp. 57, 61 (S.D.N.Y.1995); *Levesque v. Levesque*, 816 F.Supp. 662, 666 (D.Kan. 1993); *Friedrich v. Friedrich*, 983 F.2d 1396, 1400–1401 (6 th Cir.1993). The definition of habitual residence must be determined by the facts and circumstances presented in each particular case. *Id., citing Meredith v. Meredith*, 759 F.Supp. 1432, 1434 (D.Ariz.1991). As reflected in *Harsacky*, the test for determining habitual residence under the settled purpose analysis is broader than domicile.

There are alternative approaches to determining a child's habitual residence, *see Harsacky v. Harsacky, supra*, however, this Court has previously decided that a determination of habitual residence "must focus on the child, not the parents, and examine past experience, not future

intentions." *Harsacky*, 930 S.W.2d at 415 (*quoting Friedrich v. Friedrich*, 983 F.2d at 1401). Under this test, the record supports the trial court's determination that Greece was Bronte's habitual residence immediately prior to her removal.

Following Bronte's birth, the parties at all times maintained their home in Greece, and at no time lived together as a family unit in the United States with the intention of making the United States their permanent home. The evidence shows that Bronte's permanent home, at all times following her birth and prior to her removal, was Greece, and that her three- to four-month trips to the United States in 1992, 1993, and 1994 were temporary visits to this country for the purpose of visiting her maternal relatives. Greece has been the center of Bronte's life.

Gia's argument that the United States was Bronte's habitual residence because the parties held United States social security numbers, bank accounts, driver's licences, had once consulted with a U.S. realtor, and had plans to move and settle in the United States following Emmanuel's retirement is unpersuasive. These connections do not overcome Bronte's more prevalent and continuing contacts with Greece.

Also unpersuasive is Gia's assertion that her residence in Greece for the year preceding her departure "was not consensual." The Greek Court orders establish that Emmanuel's efforts to prevent Bronte's removal from Greece, though disapproved of by Gia, were pursuant to Greek law. Even if Gia's last year in Greece was "not consensual" — and the evidence is that she could have returned without Bronte to the United States at anytime — this would not alter Bronte's habitual residence from Greece to the United States.

In view of the foregoing factors, the trial court properly concluded that Bronte's habitual residence was Greece.

Gia next contends that the trial court erroneously concluded that Gia breached Emmanuel's custody rights when she left Greece. The objective of the Hague Convention is to protect children who are "wrongfully removed" from their country of habitual residence. Hague Convention art. 1.

The Hague Convention art. 3 provides as follows:

> The removal or the retention of a child is to be considered wrongful where—
>
> a it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention;
>
> and
>
> b at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

■ The burden is on the petitioner, here, Emmanuel, to establish that the minor child was wrongfully removed within the meaning of the Hague Convention by a preponderance of the evidence. 42 U.S.C. § 11603(e)(1); *In re Ponath* 829 F.Supp. 363 (D.Utah 1993).

■ Rights of custody may arise by judicial decision.[1] Hague Convention art. 3.

---

1. Under the Hague Convention, whether a parent was exercising lawful custody rights over a child at the time of removal must be determined under the law of the child's habitual residency, Hague Convention art. 3; *Friedrich*, 983 F.2d at 1402. Neither the trial court, nor either party on appeal, applied or cited relevant Greek statutory or case law relevant to the issue of whether Emmanuel had existing "custody rights" to Bronte at the time of Bronte's removal and whether Emmanuel was "exercising" those "custody"

The Athens order of April 22, 1996, prohibited Gia from removing Bronte from Greece pending a final resolution of the parties' custody dispute. Admittedly, the Chania decision of June 28, 1996, awarded temporary custody to Gia. The June 28 order, however, also cited the previous prohibition on removing Bronte from Greece. The June 28 order took no action to diminish or lessen the effect of the Athens prohibition of removal. In addition to this, the Chania decision of July 22, 1996, defined liberal and specific visitation rights for Emmanuel and threatened Gia with fines and imprisonment if she violated the provisions of the order. These orders were entered prior to Gia's removal of Bronte and, together, establish beyond a preponderance of the evidence that Emmanuel had custodial rights to Bronte under Greek law by virtue of judicial decision.

Gia's argument, that since the June 28, 1996, Chania order awarded her sole temporary care of Bronte, Emmanuel was divested of all custodial rights, is unpersuasive. The order as translated was, on its face, a temporary order, pending final resolution of the custody issue. Pursuant to the orders, Emmanuel had ongoing "custodial rights" and was, in fact, seeking as a final resolution permanent sole custodial rights for himself. Indeed, following Gia's removal of Bronte, Emmanuel was granted custody of the child by the Chania court in its February 28, 1997 order.

Visitation rights alone, such as those granted to Emmanuel in the July 22, 1996, Chania order have been held to fall within the meaning of "custodial right." *See David S. v. Zamira S.,* 151 Misc.2d 630, 574 N.Y.S.2d 429 (1991). *David S.* acknowledged that visitation rights may not always equate to custodial rights. The case nevertheless held that such a distinction was meritless where a respondent, *i.e.,*

the removing parent, engaged in "contemptuous conduct" in removing the child from its habitual residence. In view of the pending court orders prohibiting the removal of Bronte from Greece, Gia similarly acted in contempt of Greek court orders by nevertheless removing Bronte. Accordingly, *David S.* provides a rule appropriate to this case.

Finally, in view of Emmanuel's active and ongoing legal efforts prior to, at the time of, and subsequent to Gia's removal of Bronte, it is clear that Emmanuel was exercising his custodial rights, or would have but for Gia's removal of Bronte.

Gia next contends that the trial court did not properly consider Gia's evidence that returning Bronte to Greece would subject her to a grave risk of physical and psychological harm under Article 13b. Article 13b establishes an affirmative defense to an otherwise wrongful removal and provides that

the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that—

. . . .

b there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

. . . .

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

■ A respondent who opposes the return of the child has the burden of proving

---

rights at the time of her removal. However, as discussed *infra,* the record established by a preponderance of the evidence that Emmanuel had custodial rights by "judicial decision,"

and the ongoing custody litigation in the Greek courts supports that by a preponderance of the evidence he was attempting to "exercise" those rights.

that the exception set forth in article 13b exists by clear and convincing evidence. 42 U.S.C. § 11603(e)(2). "Clear and convincing proof does not necessarily mean uncontradicted proof. It is sufficient if there is proof of a probative and substantial nature carrying the weight of evidence sufficient to convince ordinarily prudent-minded people." *Rowland v. Holt*, Ky., 253 Ky. 718, 70 S.W.2d 5, 9 (1934).

Gia alleges that, at trial, she established that Bronte would face an "intolerable situation" if returned to Greece. Gia further alleges that she has established the insufficiency of the Greek judicial system and its unwillingness to protect the interests of non-Greek citizens. In support of this position, Gia cites several examples of violent behavior by Emmanuel toward herself and Bronte. Among these: (1) Emmanuel's regular manner of punishing Bronte is to "give her a smack on the back"; (2) on one occasion Emmanuel went into a violent rage, destroyed items in the house, and pushed Gia and Bronte to the floor; (3) on one occasion Emmanuel pulled Gia's hair so violently during a quarrel that she was hospitalized with severe neck injuries; and (4) on one occasion Emmanuel tore up Bronte's passport. Gia also refers us to the June 28, 1996, Chania order which recounts accusations of violence by Emmanuel toward herself and Bronte.

Gia moreover presented the testimony of a child psychologist who testified that Bronte was suffering from (1) post-traumatic stress syndrome; (2) probable sexual, physical and emotional abuse; and (3) probable child neglect. The psychologist recommended that Bronte not be returned to Greece. The trial court made a specific finding that it "does not find the psychologists testimony compelling," and that "[i]t is lacking in substantiation and does not establish that returning Bronte to Greece would subject her to grave and intolerable injury."

We adopt the following analysis of Gia's 13b argument from the order of the trial court:

The 13(b) exception under the [Hague] Convention must be narrowly construed. *Rydder v. Rydder*, 49 F.3d 369 (8 th Cir.1995); *Nunez–Escudero v. Tice-Menley*, 58 F.3d 374 (8 th Cir.1995); *Feder v. Evans–Feder*, 63 F.3d 217 (3 rd Cir.1995). Most of the evidence presented by Gia was more closely akin to that which might be relevant in a custody proceeding. That type of evidence is not relevant in a 13(b) hearing. *Tahan v. Duquette*, 259 N.J.Super. 328, 613 A.2d 486 (A.D.1992); *In Re Petition For Coffield*, 96 Ohio App.3d 52, 644 N.E.2d 662 (11 Dist., 1994). In *Friedrich v. Friedrich*, 78 F.3d 1060 (6 th Cir.1996)[ ] Judge Boggs' opinion very succinctly states how the court should view the 13(b) exception:

The exception for grave harm to the child is not license for a court to speculate on where the child would be happier. That decision is a custody matter, and reserved to the court in the country of habitual residence.

*Id.* at 1068.

Judge Boggs then goes on to define exactly when the 13(b) exception should apply:

[w]e believe that a grave risk of harm for the purposes of the [Hague] Convention can exist only in two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute — e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Id.* at 1069.

The evidence offered by Gia in support of her 13(b) argument, psychological and otherwise, simply does not establish that Bronte faces a grave risk of harm if she is returned to Greece. There is abso-

lutely no competent evidence before the Court that Bronte has been abused or neglected by Emmanuel, or that Bronte faces certain danger in Greece. Likewise, there is no evidence that the courts in Greece cannot protect Bronte. Indeed, the last order issued before Gia left gave Gia temporary custody, subject to certain conditions. This court has absolutely no reason to believe that the Greek Courts will not properly and adequately decide the ultimate issue of custody, and protect Bronte's interests in so doing. The Court concludes that Gia has failed to satisfy her 13(b) burden.

■ Gia next alleges that the trial court did not properly consider her evidence that returning Bronte to Greece would violate fundamental principles of human rights under Article 20 of the Hague Convention. More particularly, Gia alleges that (1) the actions of the Greek police in physically removing her and Bronte from a plane in Athens, holding her in isolation at the station for several days without food, water or restrooms, and subjecting her to physical and verbal abuse violated various articles of the International Covenant on Civil and Political Rights, December 16, 1966, 6 I.L.M. 368 (entered into force March 23, 1976) (hereinafter ICCPR); (2) that various articles of the ICCPR were violated when Emmanuel destroyed Bronte's passport and Greek authorities forcibly prevented her and Bronte from moving freely from one place to another; and (3) she was denied assistance of counsel in custody proceedings in violation of the ICCPR. The burden is on Gia to establish an Article 20 exception by clear and convincing evidence. 42 U.S.C. § 11603(e)(2).

We adopt the trial court's analysis of this issue:

Gia also asserts that the return of Bronte to Greece should be denied pursuant to Article 20 of the [Hague] Convention. Gia's burden under this Article is to show, again by clear and convincing evidence, that the return of Bronte "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.["] [Hague Convention art. 20]. "With respect to an Article 20 defense, it places a heavy burden on the respondent." *Caro v. Sher*, 296 N.J.Super. 594, 687 A.2d 354 (1996). The court in *Caro* relied on the Explanatory Report as to the adoption of the [Hague] Convention, prepared by Elisa Perez–Vera, to explain Article 20:

To be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject matter of the [Hague] Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with those principles ... A study of the case law of different countries shows that the application by ordinary judges of the laws on human rights and fundamental freedoms is undertaken with a care which one must expect to see maintained in the international situations which the [Hague] Convention has in view.

This exception, like the others, was intended to be restrictively interpreted and applied, and is not to be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed.

*Caro, supra* at 359.

In Gia's case, her complaints are with the way she was treated by the Greek police and court system. Her complaints are no different than those this Court has heard many times before from defendants in proceedings in Kentucky. This Court finds no evidence that the Nation of Greece is suspect in its treatment of Gia and/or Bronte. Gia's Article 20 defense is totally without merit.

 Finally, Gia alleges that the trial court's findings of fact should be set aside as clearly erroneous. "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ky. R. Civ. Proc. (CR) 52.01. Findings of fact are not clearly erroneous if supported by substantial evidence. *See Black Motor Company v. Greene,* Ky., 385 S.W.2d 954 (1965). The test for substantiality of evidence is whether when taken alone, or in the light of all the evidence, it has sufficient probative value to induce conviction in the minds of reasonable men. *Kentucky State Racing Commission v. Fuller,* Ky., 481 S.W.2d 298, 308 (1972).

Gia identifies three examples of erroneous findings by the trial court: (1) the trial court's assertion that "there is simply no evidence in the case before the court that Gia was ever prevented from leaving Greece;" (2) the trial court's erroneous characterization of Gia's departure from Greece as a violation of the Athens court order; and (3) the trial court's disregard of the corroborated testimony provided by Gia's child psychologist witness which documented Bronte's fragile psychological condition and the severe emotional harm she would suffer if separated from her mother. There was conflicting evidence regarding each of these matters and the trial court, as the finder of fact in this proceeding, was in a better position to weigh the credibility of the witness and resolve the conflicting evidence. There was substantial evidence to support the trial court's findings of fact, and hence we may not set aside those findings.

For the foregoing reasons, the judgment of the Hardin Circuit Court is affirmed.

ALL CONCUR.