RENDERED: FEBRUARY 3, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1294-MR

CHRISTOPHER CAMERON, JR.       APPELLANT

       APPEAL FROM GREENUP CIRCUIT COURT
v.       HONORABLE JEFFREY L. PRESTON, JUDGE
        ACTION NO. 13-CI-00210

EMILY SMITH           APPELLEE

<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE: CETRULO, JONES, AND McNEILL, JUDGES.

CETRULO, JUDGE: Appellant Christopher Cameron, Jr. ("Father"), *pro se*,

appeals the Greenup Circuit Court order denying his motion for visitation[1] with his

three minor children (the "children").

---

[1] The motion was officially titled, "Motion to Establish Reunification Plan with Minor Children" but detailed a plan to start visitation; therefore, we will refer to it as such.

## I.     FACTUAL AND PROCEDURAL HISTORY

In 2013, Father and appellee Emily Smith ("Mother") dissolved their marriage. The dissolution decree granted them joint custody of the children and designated Mother as primary residential parent. The decree further provided that Father would receive visitation/timesharing according to Schedule B of the Greenup County Visitation Guidelines.[2] After years of tension between Mother and Father and Father continuously attempting to modify his child support payments to Mother, the event that spurred this litigation occurred.

In 2018, the Cabinet for Health and Family Services[3] filed a lien on Father's bank account for past-due child support, which froze his account. Father learned of the freeze while on a camping trip with the children and went into a frenzy in front of the children, threatening to kill Mother. Mother then filed a motion for immediate relief to suspend Father's visitation. In her affidavit, Mother stated that Father had told the children that "it was 'D-Day' and he had a loaded gun in the car." Further, she testified that Father had told her to sleep with one eye open and said he was going to shoot her, then told the children "that they should

---

[2] Usually, he had the children twice a week and every other weekend.

[3] The Cabinet for Health and Family Services was not involved in this action aside from its administration of child support payments.

call [Mother] to say goodbye because he was going to jail, and [she] was going to heaven."

Additionally, Mother stated in her affidavit that Father used one of the children "as a hostage" – refusing to let her participate in a basketball tournament – to try to force Mother to sign paperwork stating he did not owe child support arrearages. On another occasion, Mother testified that Father grabbed her during a child drop-off and told her he would kill her. Mother explained that the children were "terrified" of Father and the youngest child repeatedly asked whether they would have to see him again and whether he would bring them back to her. In a separate matter,[4] an emergency protective order was put in place against Father.

Following a hearing on Mother's motion, in late-October 2018, the circuit court entered an agreed order suspending Father's visitation/timesharing and contact with the children. Further, the order stated that the children would attend counseling; that Father would attend counseling for his anger and parenting issues; and that Father could not contact Mother or the children.

A month and a half later, in December 2018, Father moved to reinstate visitation; or in the alternative, to allow telephone communication. Father

---

[4] Additionally, Father was charged with terroristic threatening due to his actions toward Mother. One of Father's bond conditions in that case was to stay away from, and have no contact with, Mother or the children.

argued that he had attended five[5] counseling sessions and felt he should have visitation again. However, Mother noted that the children had been in counseling for only a short time and still needed to work through the traumatic events that had occurred. The circuit court ordered that Father could have telephone contact with the children only upon recommendation of the children's counselor ("Counselor Nichols"). Counselor Nichols never recommended such contact.

This pattern continued for the next couple of years: Father would move to alter his visitation every few weeks; Mother would argue that the children were not yet ready; and the circuit court would request that Father submit documentation showing his counseling progress. Father would fail to submit such documentation and the circuit court would deny his motion.

Eventually, Father moved the circuit court to appoint a Friend of the Court ("FOC") and recommended Honorable Kristin Francis. The circuit court then appointed Honorable Kristin Francis as FOC ("FOC Francis") to interview the parties and children and provide a report to the circuit court.

At the end of May 2019, FOC Francis submitted her report on behalf of the children. In preparation, FOC Francis had reviewed the record, interviewed Counselor Nichols, attempted to contact Father's counselor multiple times, and

---

[5] The first letter from Father's counselor stated he had been seen for five appointments; however, the second letter stated the counselor had seen him on four occasions.

interviewed the children.  The report stated that Counselor Nichols, however, had contacted Father's counselor and the counselors spoke extensively about Father's progress.  Father's counselor told Counselor Nichols that Father's sessions focused on "what he c[ould] do to get his kids back" not his anger issues.  Counselor Nichols noted that she believed Father needed to address his anger issues, specifically when intoxicated.

Further, Counselor Nichols emphasized the children's "tremendous fear of their father."  As such, Counselor Nichols did not believe it was safe for the children to visit with Father until he had fully addressed his anger issues with his counselor.  At that point, she did not believe he had done so.

During the interview with Father, he told FOC Francis that the contentious relationship with Mother "boiled down to money" and he confirmed that he had made comments about hurting Mother in front of the children, which he regretted.  He admitted that he was a "high intensity person" who let himself get overly emotional in front of his children.  However, FOC Francis did note that he seemed distraught that he could not see the children and he stated he would do whatever was necessary to be able to see them.

When FOC Francis interviewed the children, they recounted the events from the 2018 camping trip.  They explained that Father first got angry because one of the children wanted to attend basketball practice.  They noted that

Father began throwing things, including a glass of wine, and made multiple comments about killing Mother. The oldest child also stated that she overhead Father say, "I can't wait to see the way [Mother's] eyes pop out of her head when I choke her." They further noted that during the camping trip, Father continued to drink alcohol and became angrier, then got in his car to drive away and told the children that he had a loaded gun and was going to go find Mother to kill her.

Ultimately, the children made it clear to FOC Francis that they did not have any desire to visit with Father after the camping trip. They each reported being terrified of seeing him because they feared he would be angry with them for not wanting to see him. They stated that there was no scenario in which they would want to see Father.

Following FOC Francis's report, Father continued to violate the circuit court's orders and contacted Mother, incessantly. Further, he failed to pay for the children's counseling sessions, per the court's orders. Father admitted that he had violated the orders, and the circuit court found him in contempt. The circuit court sentenced Father to 60 days of incarceration, suspended so long as Father paid the counseling fees and did not contact Mother or the children.

Father then moved for production of the children's counseling records and for a status conference. Mother noted that the "guardian ad litem/friend of the

court"[6] had been appointed to review such documents and had already reported her findings to the court. The circuit court overruled Father's motion and ordered the "Guardian Ad-litem" to file a report on the status of counseling. Additionally, Father was to file a report on the status of his counseling.

FOC Francis then supplemented her report with an update on the children's counseling. FOC Francis explained that the children had been seen multiple times, with sessions ending in May 2019. Counselor Nichols had reported that the children did very well during their sessions, and they had ceased sessions because they were "secure and comfortable" with Mother. At that time, Counselor Nichols had not been updated on Father's counseling progress. FOC Francis again attempted to contact Father's counselor – multiple times – but was unsuccessful.

When FOC Francis spoke with Father on his progress, he mentioned that he did not believe he needed to continue counseling. FOC Francis informed him that Counselor Nichols had spoken with his counselor and concluded that he needed to continue his counseling sessions. At that point, Father noted that he had not been to counseling in "a couple of months."

Then again, in late 2019, Mother moved for contempt of Father and for his incarceration. Father had shown up to two of the children's ballgames,

---

[6] After using both terms, Mother's counsel used "guardian ad litem" throughout the response. This is noted because Father later argues that such misidentification of FOC Francis was an "abuse of discretion."

despite the circuit court's June 2019 order stating "absolutely no contact with [Mother] or [the children] . . ." and Father previously being found in contempt for contacting Mother. These incidents triggered the youngest child's anxiety, which led to reinstatement of his counseling sessions. In October 2019, the circuit court found Father had violated the June 2019 order on three separate occasions when he attended the children's ballgames and contacted one of the children. Therefore, the circuit court set aside the incarceration suspension and sentenced Father to 60 days in the Greenup County Detention Center.

In late October 2019, Father's attorney withdrew, citing that he could be of no further assistance to Father and that there were no matters pending for which Father needed representation.

Throughout 2019 and 2020, the pattern continued, with Father filing back-to-back-to-back motions with the circuit court for visitation. The circuit court denied each of them, however, because Father failed to submit documentation of his counseling progress, as requested. Finally, in October 2020, Father began counseling in Washington, D.C., and his counselor noted in a letter that he had attended six appointments. Upon the recommendation of the counselor, Father completed a four-hour virtual anger management class in January 2021 and a four-hour virtual co-parenting class in February 2021. Additionally, he completed a psychological evaluation in March 2021.

In June 2021, Father filed a motion to establish a reunification plan with the children and attached a letter from his counselor noting his attendance and progress; certificates of completion from his two online courses; the psychological evaluation report; reference letters from a neighbor, a life coach, and a family friend; and affidavits from Father's mother and brother. Specifically, the motion requested that the circuit court amend the October 2018 order, which had modified Father's visitation rights, to "create a clear path toward reunification with [the] children."

Further, the motion claimed that the record was "missing key facts and details that could have dramatically altered the direction of this case and the Court's impression of [Father]."[7] Finally, Father insisted that he was ignorant when he "hastily" signed the October 2018 agreed order "under intense duress, under bad legal counsel and under the assumption his children were going to testify against him in open Court."

---

[7] These "missing facts" included Father's insistence that he had apologized to his children on the evening of the 2018 camping trip, "[y]et for some unknown reason, the two adults who actually saw what happened [that night] were never called to testify . . . ." Additionally, Father claimed his previous attorney was largely the reason for his troubles. He claimed the attorney told Father he could attend his children's sporting events following the no contact order and that the attorney failed to inform him of the cease-and-desist letter following his first appearance at a game. Further, Father claimed there was a conspiracy to "hide" these facts from the circuit court. Father concluded that the attorney's actions created the "impression" that he had no respect for the court's orders, the cease-and-desist letter, Mother, or his children, not that he, in fact, had no respect for them. Father claimed that his former attorney "told [Father] to commit [contempt]."

Father then proposed a three-phase therapeutic reunification plan. Phase One incorporated supervised Skype calls and eventual supervised visits of increasing length, all while continuing counseling. Phase Two then incorporated longer, unsupervised visits and Phase Three added mediation to determine a future parenting schedule, and rights and responsibilities moving forward. The parties would not move on from Phase One until Father provided status updates to the circuit court and it ordered advancement to Phase Two.

In response, Mother emphasized that Father had downplayed his role in the situation, blaming his shortcomings on his previous attorney and failing to acknowledge that he had engaged in acts of violence and terroristic threatening. The children had residual effects of the trauma and had no desire to communicate with Father. Mother added that the company with which Father completed his online courses recommended eight hours for each of the courses, not eight hours total. Therefore, Mother concluded that Father attempted the "bare minimum" to check off some boxes. Finally, Mother objected to the admission of the remaining attachments because they were uncertified and there had not been an opportunity for cross examination.[8]

In September 2021, the circuit court heard Father's motion for visitation. Present were Mother, represented by counsel; Father, *pro se*; Counselor

---

[8] This Court did not consider these documents in this Opinion.

Nichols; FOC Francis; Lawrence Craft, Father's friend; and Gail Cameron, Father's mother. Father testified that he had three sessions with his counselor over the course of three years, with his last session six months prior to the hearing. Further, he testified that he renewed his faith, stopped drinking as regularly, and promised that he was a changed man.

Mother testified that the children were more relaxed without visitation, and each could act more like "normal children." Further, she testified that the oldest child had blocked Father on her phone. Mother noted that the youngest was much calmer now but still occasionally fixated on whether the house doors were locked, if he was triggered. Mother also emphasized that the children had no desire to see Father and that they never talked about him.

Counselor Nichols testified that the two older children met with her only a couple of times because they were able to get to a stable place quickly. The youngest child, however, took longer to process that summer's events, then had restarted counseling once Father unexpectedly showed up at his game the next year. Counselor Nichols further testified that she did not think Father's counseling had been sufficient because it had not specifically addressed his anger. She still had concerns about the children restarting visitation with Father. She emphasized that the long-term work Father needed to complete before reuniting with the children could not have been completed in three sessions over three years. She

-11-

explained that until those standards were met, she could not recommend reunification.

FOC Francis then testified as FOC.[9] Further, FOC Francis stated that she had interviewed the children multiple times since 2019 and reviewed the counseling records. FOC Francis recommended that the children not have contact with Father. She noted that the children had "come into [her] office and expressed a fear that [Father] will hurt [Mother] that exceeded anything I have seen in a very long time. [The youngest child] really lives with that fear." She was adamant that the children did not want to see Father. FOC Francis applauded Father's ability to get "over" the events from 2018, but made it clear that the children still had not.

Lawrence Craft testified as to Father's character, but noted that he had not been in contact with Father since Father moved to Washington, D.C. several years earlier. Finally, Gail Cameron testified that she had not seen the children since August 2018, but she believed that her son had changed.

In October 2021, the circuit court overruled Father's motion for visitation because despite a few statements and "certificates of completion," Father failed to provide proof that there had been any change in his behavior by way of

---

[9] The circuit court and FOC Francis clearly stated that she was "appointed as Friend of the Court, as opposed to Guardian ad litem" and that she had submitted her reports in that capacity, but she would testify, if asked, because she had spoken with the children since she submitted her initial reports. Further, FOC Francis testified that she was "not the guardian ad litem, [she was] not representing them in that particular way, but [she had] formed a relationship with the children and they don't want this."

professional testimony or other evidence to verify his position. The circuit court reminded the parties that it had stopped contact due to Father's "outrageous behavior and the harm that it was doing to the children." Absent evidence that such behaviors had changed, the circuit court would not reinstate visitation at that time.

Additionally, the circuit court emphasized that the children still did not want contact with Father – noting the oldest child had blocked him from her phone. The testimony provided that the children had not yet gotten over Father terrorizing them and threatening to kill Mother. As such, the circuit court found by clear and convincing evidence that it would be detrimental to the children to reintroduce Father into their lives "at that time." Further, the circuit court noted Counselor Nichols's concerns about the children being around Father and FOC Francis's recommendation that the no contact order remain in place.

Father appeals the circuit court's October 2021 order denying his motion for visitation.

## II.     STANDARD OF REVIEW

This Court will not reverse a circuit court's decision regarding visitation unless the "determination constitutes a manifest abuse of discretion or was clearly erroneous in light of the facts and circumstances of the case." *Ryan v. Ryan*, 473 S.W.3d 637, 639 (Ky. App. 2015) (citing *Drury v. Drury*, 32 S.W.3d

521, 525 (Ky. App. 2000)).  "The test is not whether we would have decided the issue differently, but whether the findings of the trial court were clearly erroneous or an abuse of discretion."  *Id.* (citing *Cherry v. Cherry*, 634 S.W.2d 423, 425 (Ky. 1982)).

## III.  ANALYSIS

Father claims that the circuit court abused its discretion regarding multiple findings:  (A) that it *de facto* terminated his parental rights without due process; (B) that it did not make a reasonable effort to reunify the children with him; (C) that FOC Francis did not comply with her statutory obligations as a Friend of the Court; (D) that Counselor Nichols did not provide a clear plan of care; (E) that the circuit court adopted erroneous facts; and (F) that the circuit court failed to prepare an adequate "Finding of Facts and Conclusions of Law" under CR[10] 52.01.

### A.    *De facto* **Termination of Parental Rights**

First, Father argues that the circuit court *de facto* terminated his parental rights without due process.  Father acknowledges that he voluntarily suspended his visitation/timesharing schedule in the October 2018 agreed order;

---

[10] Kentucky Rule of Civil Procedure.

-14-

however, he argues that the failure of the October 2021 order to establish a reunification plan permanently terminated his parental rights.[11]  We disagree.

As stated, "the family court has broad discretion" to modify timesharing.  *Layman v. Bohanon*, 599 S.W.3d 423, 431 (Ky. 2020) (citation omitted).  Therefore, the question before this Court is whether the circuit court abused that discretion when it denied Father's motion for visitation, "in light of the facts and circumstances of the case."  *Drury*, 32 S.W.3d at 525.

Generally, the Kentucky Supreme Court has explained that it has two options when determining whether to modify visitation:  it could (1) modify visitation if it found that would be in the best interest of the children; or (2) it could restrict timesharing if it found the children's "physical, mental, moral or emotional health was seriously endangered."  *Layman*, 599 S.W.3d at 431 (citing KRS[12] 403.320(3)); *see also Moore v. Moore*, 626 S.W.3d 535, 538 (Ky. 2021) (citing KRS 403.320(3)).

However, this Court has clarified that the analysis shifts slightly when "a prior order . . . denied visitation."  *McNeeley v. McNeeley*, 45 S.W.3d 876, 877 (Ky. App. 2001).  In those cases, "the presumption of entitlement to visitation is no

---

[11] Father summarizes the history of the case and the resulting string of orders.  Further, he takes issue with nearly all of them, claiming each is contradictory and unfair.  However, importantly, those orders are not on appeal.  Therefore, our focus remains on the October 2021 order before this Court, which denied Father's motion for visitation.

[12] Kentucky Revised Statute.

longer a factor[,]" and "the standard for modification is not serious endangerment; rather, the best interests of the children governs." *Id.* at 877-78 (citing *Hornback v. Hornback*, 636 S.W.2d 24, 26 (Ky. App. 1982)).

Here, the circuit court had previously denied Father's motions for visitation (on multiple occasions); therefore, there was no longer a presumption of entitlement to visitation and the best interests of the children governed. The circuit court followed that standard and conducted a best interest analysis, which found – based, in part, on Mother, Counselor Nichols, and FOC Francis's testimonies – that the children had not yet gotten over Father terrorizing them and threatening to kill Mother. As such, the circuit court found by clear and convincing evidence that it would be detrimental to the children to reintroduce Father into their lives "at that time." Further, the circuit court found that Father had not provided adequate evidence that he had overcome the issues that resulted in the agreed order.

Counselor Nichols and FOC Francis did not mince words when they proclaimed that they did not recommend the children be around Father. Further, the oldest child's decision to block Father on her personal phone weighed heavily on the circuit court. The circuit court's reliance on such evidence in maintaining the current visitation schedule – again, "at this time," *not* permanently – was supported by sufficient evidence and not an abuse of discretion.

-16-

Additionally, Father argues that the circuit court "circumvented the clear statutory processes" to involuntarily terminate his parental rights. He argues the circuit court's failure to adhere to KRS 625.050-KRS 625.090 when terminating his rights deprived him of due process. As Mother noted, however, termination of parental rights under those statutes is a completely separate cause of action – one which we do not find here, not even "*de facto.*" As such, the circuit court's avoidance of statutes that did not apply was not an abuse of discretion.

## B.     Reasonable Efforts to Reunify

Father next argues that the circuit court did not make a "reasonable effort" to reunify Father with the children. Importantly, however, the circuit court had no duty to do so. Despite Father's acknowledgement of that reality, he essentially argues that it is unfair for parents in dependency, neglect, and abuse actions[13] to have greater opportunities to reunify with their children than he did. Although we are sensitive to Father's desire to reunify, we cannot ascribe duties to the circuit court from statutes under which this action was not brought. Unfortunately, perceived lack of fairness is not a legal cause of action.

---

[13] Father also notes that the Family First Prevention Act – another piece of legislation irrelevant to this case – references "reasonable efforts."

## C. Friend of the Court Duties

Third, Father argues that FOC Francis did not comply with her statutory obligations as Friend of the Court because (1) she did not complete a thorough investigation; and (2) she acted in the capacity of a guardian *ad litem* and Friend of the Court. It is unclear exactly what Father is claiming, but he states that because FOC Francis is an officer of the court, Father applied "the 'abuse of discretion' standard of review to [FOC Francis's] investigation and recommendations." He therefore concludes that because "[FOC Francis] abused her discretion," the circuit court did as well.

Importantly, however, appellate standards of review apply to the order on appeal, *i.e.*, the order this Court is reviewing. Therefore, here, this Court uses the applicable standard of review to analyze the October 2021 order. Father's standard for his own "review" of a third-party's report is irrelevant and does not transfer to the circuit court. Further, if Father took issue with FOC Francis's reports, he needed to address those with the circuit court years ago, when she submitted them. This Court may only *review* such claims; we cannot make the initial determinations regarding them. *Drury*, 32 S.W.3d at 526 ("Since the issue was not raised in the proceeding below prior to the filing of the notice of appeal, we conclude that it is not properly presented on appeal.").

-18-

Nevertheless, here, FOC Francis interviewed the children, their counselor, Mother and Father, and reviewed the counseling records and case history. Further, she provided detailed reports describing the family dynamics, the events that led to those issues, and the children's progress during counseling. The circuit court did not abuse its discretion by relying, in part, on the work product for which it had appointed her.

Second, the record is clear that FOC Francis understood the capacity under which the circuit court appointed her. During the 2021 hearing, the circuit court and FOC Francis clearly acknowledged that she was "appointed as Friend of the Court, as opposed to Guardian ad litem" and that she had submitted her reports in that capacity. She agreed to testify, if asked, because she had spoken with the children since she had submitted her initial reports. Neither party objected. Further, FOC Francis testified that she was "not the guardian ad litem, [she was] not representing them in that particular way, but [she had] formed a relationship with the children" and testified as to that relationship.

There is substantial evidence that FOC Francis and the circuit court were aware of FOC Francis's capacity, despite a single motion and order from years earlier that used "guardian ad litem" instead of "friend of the court." FOC Francis clearly understood that she was serving as FOC and had submitted her reports and testified as such. The circuit court did not abuse its discretion.

### D. Counselor Nichols's Plan of Care

Fourth, Father claims that Counselor Nichols did not provide a clear plan of care. He argues that 201 KAR[14] 36:040(4), the Code of Ethics for Licensed Professional Counselors, compelled Counselor Nichols to devise a counseling plan for the children. And further, that her failure to do so "led the [circuit] court to abuse its discretion."

Again, that issue was never raised with the circuit court and is not properly before this Court. *Drury*, 32 S.W.3d at 526. Father never questioned whether Counselor Nichols had developed a plan for the children or whether she had violated her code of ethics in the circuit court.[15] But even if he had tried, the circuit court was not the appropriate venue to initiate such action. The appropriate administrative process requires submission of a complaint under 201 KAR 36:050. The circuit court did not abuse its discretion.

### E. Erroneous Facts

Although Father claims that the circuit court adopted erroneous facts, facts are not "clearly erroneous if supported by substantial evidence." *Ehret v. Ehret*, 601 S.W.3d 508, 511 (Ky. App. 2020) (citing *Janakakis-Kostun v.*

---

[14] Kentucky Administrative Regulation.

[15] Further, the circuit court was evaluating *Father's* adherence to a counseling program to determine whether his anger management and parenting issues had been mitigated. At that point, whether and how much the children attended counseling was irrelevant to when Father could restart visitation.

*Janakakis*, 6 S.W.3d 843, 852 (Ky. App. 1999)). "Substantial evidence is that evidence, when taken alone or in the light of all the evidence, has sufficient probative value to induce conviction in the minds of reasonable people." *Id.*

Therefore, the question before this Court is whether the circuit court's findings of fact were supported by evidence of sufficient probative value. Specifically, Father takes issue with two such "adoptions" of erroneous fact: (1) the circuit court's alleged renaming of Father's motion; and (2) the circuit court's statement that Father had not provided proof by way of professional testimony or other evidence to verify his position as "a changed man." We will focus on those.

First, Father claims that the circuit court referred to his motion as "[Father's] Motion to Start Visitation or Contact with the Parties' Children" instead of "Motion to Establish Reunification Plan with Minor Children," which Father took to mean that the circuit court did not make a "fair decision." We disagree.

The circuit court's title, although modified, relayed the correct request: that Father was asking the court to begin visitation or begin contact with the children. Father's motion, as discussed, laid out a plan to start video calls, supervised visits, and unsupervised visits with the children; *i.e.*, start visitation/contact with the children. There was substantial evidence that Father was requesting visitation/contact with the children in his motion. As such, the

circuit court's decision to refer to the motion in that capacity, but without using Father's chosen terms, was reasonable and does not constitute reversible error.

Second, Father argues that the attachments to his motion detailed the therapeutic steps he took to address his anger and parenting and provided evidence of his position. Again, we disagree. The circuit court's October 2021 order specifically took issue with Father's failure to present *professional testimony* to verify his "changes." The only professionals who testified at the hearing were Counselor Nichols and FOC Francis. Neither of them recommended that visitation resume at that point.

Father simply called a friend of his and his mother to testify. That was hardly the professional credibility that the circuit court sought. Further, the attachments to Father's motion contained informal letters from therapists and references and printed "certificates of completion," none of which were certified nor taken under penalty of perjury. Again, there was substantial evidence that Father did not present "professional testimony" at the hearing (or in his motion); therefore, the circuit court did not err when it stated as much.

**F.     Findings of Fact and Conclusions of Law under CR 52.01**

Lastly, Father argues that the circuit court abused its discretion because it labeled its October 2021 order, "ORDER" and did not title it "Finding of Facts and Conclusions of Law." Additionally, Father argues that the order failed to

make the findings "highly specific," as required by *Hicks v. Halsey*, 402 S.W.3d 79, 84 (Ky. App. 2013). However, Father does acknowledge that the circuit court "appeared to make several findings in its [ORDER] but they were not labeled as 'Findings of Fact.'" Finally, he argues that the court made no "Conclusions of Law."

First, CR 52.01 does not contain title requirements. The rule simply requires that the circuit court "find the facts specifically and state separately its conclusions of law thereon and render an appropriate judgment[.]" CR 52.01. It does not state that those sections must be labeled a certain way, nor that the judgment must contain a certain title. Further, it states that "[i]f an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein." *I.e.*, the form of judgment (and therefore the title) does not matter as much as the content.

As for Father's reliance on *Hicks*, as Mother points out, this was not a custody action. This was a motion for visitation. As such, the standard under *Hicks* is irrelevant. *Hicks* determined whether the aunt was a *de facto* custodian for custody purposes, under KRS 403.270(2). *Hicks*, 402 S.W.3d at 80-81. The Kentucky Supreme Court has clarified, however, that "a modification of visitation or timesharing is governed by KRS 403.320, rather than the standard for an initial

custody determination as set forth in KRS 403.270." *Layman*, 599 S.W.3d at 431. As such, a case detailing a KRS 403.270 analysis is not persuasive.

Here, Father concedes that the circuit court provided findings of fact (although not labeled as such, which again, was not required), which we discussed at length in Section A, above. Therefore, the only question that remains is whether the circuit court's order contained conclusions of law. In *Anderson v. Johnson*, 350 S.W.3d 453, 458-59 (Ky. 2011), the Kentucky Supreme Court stated that in a KRS 403.320 analysis, the circuit court's determination as to whether the modification was in the child's best interest was a conclusion of law. Here, the circuit court clearly stated in its October 2021 order that visitation with Father was not in the best interest of the children at that time, based on the testimony and recommendations of Counselor Nichols and FOC Francis and the general unwillingness of the children to interact with Father. Therefore, the circuit court's October 2021 order properly contained findings of fact and conclusions of law, and the circuit court did not violate CR 52.01.

## CONCLUSION

The circuit court did not abuse its discretion when it denied Father's motion for visitation. As such, this Court AFFIRMS the October 2021 order of the Greenup Circuit Court.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Christopher Cameron, Jr., *pro se*<br>Washington, D.C. | Sharon E. Rowsey<br>Ashland, Kentucky |